**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------X

Firepass IP Holdings, Inc. and Firepass
Corporation,

                Plaintiffs,

           -against-

Airbus Americas, Inc., Airbus S.A.S., and
Parker Hannifin Corporation,

                Defendants.

------------------------------------------------------X

Civil Action No.
1:09-cv-04234-ENV-VVP

**AIRBUS AMERICAS, INC.'S AND**
**AIRBUS S.A.S.'s ANSWER,**
**AFFIRMATIVE DEFENSES AND**
**COUNTERCLAIMS TO THE**
**COMPLAINT FOR PATENT**
**INFRINGEMENT AND**
**DEMAND FOR JURY TRIAL**

Defendants Airbus Americas, Inc. and Airbus S.A.S. (collectively "Airbus"), for their

answer and affirmative defenses to the Complaint filed by Plaintiffs Firepass IP Holdings, Inc.

and Firepass Corporation (collectively, "Firepass"), state as follows:

**NATURE OF THE CASE**

1.     Airbus denies the allegations of Paragraph 1 of the Complaint, but admits that the

Complaint contains allegations of patent infringement under 35 U.S.C. § 271.

2.     Airbus lacks knowledge or information sufficient to form a belief as to the truth of

the allegations in Paragraph 2 of the Complaint and therefore denies them.

3.     Airbus lacks knowledge or information sufficient to form a belief as to the truth of

the allegations in Paragraph 3 of the Complaint and therefore denies them.

4.     Airbus admits the allegations in Paragraph 4 of the Complaint.

5.     Airbus admits the allegations in Paragraph 5 of the Complaint.

6.      Airbus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6 of the Complaint and therefore denies them.

## FACTUAL BACKGROUND

7.      Airbus admits that on July 21, 2008, the Federal Aviation Administration (the "FAA") required operators and manufacturers of transport category airplanes to take actions that will reduce the chances of catastrophic fuel-tank explosion.  Airbus further admits that the prevention of ignition is covered by the FAA (FAR25.981) and EASA (INT- Policy 25/12) requirements.  Airbus denies the remainder of the allegations in Paragraph 7 of the Complaint.

8.      Airbus admits that the FAA requires a Flammability Reduction Means or Ignition Mitigation Means on fuel tanks having a flammability exposure exceeding certain thresholds, following the official published FAR 25, 26, 121, 125 and 129 amendments.

9.      Airbus admits that in 1998, the FAA's Aviation Rulemaking Advisory Committee (ARAC) published a report that was focused on the design, feasibility, use and testing of fuel tank inerting systems to reduce or eliminate fuel tank flammability.

10.      Airbus admits that the FAA has issued requirements for passenger and cargo aircraft.  The FAA requirements speak for themselves and Airbus denies any allegation in Paragraph 10 of the Complaint that contradicts or is otherwise inconsistent with the FAA requirements.

11.      Airbus admits that new aircraft manufactured after September 20, 2010, including the Airbus A318, A319, A320, A321, A330 and A340  models, will be required to incorporate a Flammability Reduction Means.

2

12.     Airbus admits the allegations in Paragraph 12 of the Complaint.

13.     Airbus admits the allegations in Paragraph 13 of the Complaint to the extent the allegations pertain to the Airbus A318, A319, A320, A321, A330 and A340 model aircraft. Airbus denies the remainder of the allegations in Paragraph 13 of the Complaint to the extent the allegations pertain to the Airbus A300 and A310 model aircraft.

14.      Airbus admits that the FAA has issued requirements for passenger and cargo aircraft.  The FAA requirements speak for themselves and Airbus denies any allegation in Paragraph 14 of the Complaint that contradicts or is otherwise inconsistent with the FAA requirements.

15.     Airbus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 of the Complaint that pertain to representations made by Parker and therefore denies them.

16.     Airbus admits that the Parker-designed Fuel Tank Inerting System utilizes an air separation module.  Airbus lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 16 of the Complaint that pertain to representations made by Parker and therefore denies them.

17.     Airbus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 of the Complaint and therefore denies them.

18.     Airbus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 of the Complaint and therefore denies them.

19.     Airbus admits that Airbus S.A.S. signed contracts with Parker Hannifin relating to fuel tank inerting systems.  Airbus lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 19 of the Complaint and therefore denies them.

20.     Airbus admits that Airbus S.A.S. signed contracts with Parker Hannifin relating to fuel tank inerting systems.  Airbus denies the remainder of the allegations in Paragraph 20 of the Complaint to the extent the allegations pertain to the Airbus A300 and A310 model aircraft.

21.     Airbus admits that Airbus S.A.S. signed contracts with Parker Hannifin relating to fuel tank inerting systems.  The contracts speak for themselves and Airbus denies any allegation in Paragraph 21 of the Complaint that contradicts or is otherwise inconsistent with the contracts.

22.     Airbus admits that Airbus S.A.S. signed contracts with Parker Hannifin relating to fuel tank inerting systems.  The contracts speak for themselves and Airbus denies any allegation in Paragraph 22 of the Complaint that contradicts or is otherwise inconsistent with the contracts. Airbus lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 22 of the Complaint and therefore denies them.

23.     Airbus admits that as of June 30, 2009, Airbus S.A.S. has delivered aircraft models A300, A310, A318, A319, A320, A321, A330, and A340 to United States customers.

24.     Airbus admits that as of June 30, 2009, Airbus S.A.S. had orders from United States customers for aircraft models A300, A310, A318, A319, A320, A321, A330, A340 and A350.

25.     Airbus admits that as of June 30, 2009, Airbus S.A.S. had at least 170 Airbus aircraft orders from customers within this judicial district and that 55 of such orders are pending delivery.

26.     Airbus admits that JetBlue is a customer headquartered within this judicial district and that it has taken delivery of Airbus A320 model aircraft in 2009 from Airbus S.A.S.  Airbus further states that although JetBlue is scheduled to take delivery of Airbus A320 aircraft in 2011 and 2012 from Airbus S.A.S., it can neither admit nor deny whether such delivery will take place.

27.     Airbus admits that as of June 30, 2009, Airbus S.A.S. has delivered 115 Airbus aircraft to customers within this judicial district.

28.     Airbus admits that as of June 30, 2009, there are at least 100 Airbus aircraft in operation for customers of Airbus S.A.S. within this judicial district.

## JURISDICTION AND VENUE

29.     The allegations in Paragraph 29 of the Complaint sets forth legal conclusions to which no response is required. To the extent a responsive pleading is deemed to be required, Airbus admits that this action invokes the United States patent laws, and that this Court has subject matter jurisdiction over patent law claims.

30.     The allegations in Paragraph 30 of the Complaint set forth legal conclusions to which no response is required. To the extent a responsive pleading is deemed to be required, Airbus admits that the Complaint purports to assert that venue is proper in this judicial district.

31.     With respect to Paragraph 31 of the Complaint, Airbus avers that the first sentence of said paragraph sets forth legal conclusions regarding jurisdiction to which no response is required, denies infringement of the referenced patents, and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 31, and therefore denies them.

32.     Airbus admits that Airbus Americas conducts business within the state of New York and in this judicial district but denies that it contracts to supply aircraft to this district or anywhere else in the United States which incorporate and use the claimed inventions of the patents-in-suit.  Airbus denies infringement of the referenced patents as well as the remainder of the allegations in Paragraph 32 of the Complaint.  Airbus further avers that the first sentence of said paragraph sets forth legal conclusions regarding jurisdiction to which no response is required.

33.     Airbus admits that Airbus S.A.S. conducts business within the state of New York and this judicial district and that it contracts to supply aircraft to this judicial district.  Airbus further admits that Airbus S.A.S. derives revenue from goods used in the State and this judicial district as well as from interstate commerce and/or international commerce.  Airbus denies infringement of the referenced patents as well as the remainder of the allegations in Paragraph 33 of the Complaint, but avers that that the first sentence of said paragraph sets forth legal conclusions regarding jurisdiction to which no response is required.

**THE PATENTS IN  SUIT**

34.     Airbus denies the allegations in Paragraph 34 of the Complaint.  However, Airbus avers that the '315 patent was issued on January 1, 2002 and has the title "Hypoxic fire

prevention and fire suppression systems for computer cabinets and fire-hazardous industrial containers," and that the '315 patent reissued as RE 40,065 on February 19, 2008.  Airbus further avers that Exhibit A appears to be a copy of the '315 patent and the '065 reissue.

36.     Airbus denies the allegations in Paragraph 35 of the Complaint.  However, Airbus avers that the '752 patent was issued on July 16, 2002 and has the title "Hypoxic fire prevention and fire suppression systems and breathable fire extinguishing compositions for human occupied environments."  Airbus further avers that Exhibit B appears to be a copy of the '752 patent.

36.     Airbus denies the allegations in Paragraph 36 of the Complaint.  However, Airbus avers that the '754 patent was issued on November 13, 2001 and has the title "Hypoxic fire prevention and fire suppression systems for computer rooms and other human occupied facilities."  Airbus further avers that Exhibit C appears to be a copy of the '754 patent.

37.     Airbus denies the allegations in Paragraph 37 of the Complaint.  However, Airbus avers that the '392 patent was issued on April 24, 2007 and has the title "Method of preventing fire in computer room and other enclosed facilities."  Airbus further avers that Exhibit D appears to be a copy of the '392 patent.

## COUNT I - PATENT  INFRINGEMENT BY PARKER

38.     Airbus incorporates by reference its responses to Firepass' allegations in Paragraphs 1 through 37 of the Complaint, as though fully set forth in this paragraph.

39.     Airbus admits that the Complaint contains allegations of patent infringement under 35 U.S.C. § 271 but denies infringement of the patents-in-suit.

40.     Airbus denies the allegations in Paragraph 40 of the Complaint.

41.     Airbus denies the allegations in Paragraph 41 of the Complaint.

42.     Airbus denies the allegations in Paragraph 42 of the Complaint.

43.     Airbus denies the allegations in Paragraph 43 of the Complaint.

44.     Airbus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 of the Complaint and therefore denies them.

45.     Airbus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 of the Complaint and therefore denies them.

46.     Airbus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 of the Complaint and therefore denies them.

47.     Airbus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 of the Complaint and therefore denies them.

48.     Airbus denies the allegations in Paragraph 48 of the Complaint.

## COUNT II - PATENT  INFRINGEMENT BY AIRBUS

49.     Airbus incorporates by reference its responses to Firepass' allegations in Paragraphs 1 through 48 of the Complaint, as though fully set forth in this paragraph.

50.     Airbus admits that the Complaint contains allegations of patent infringement under 35 U.S.C. § 271 but denies infringement of the patents-in-suit.

51.     Airbus denies the allegations in Paragraph 51 of the Complaint.

52.     Airbus denies the allegations in Paragraph 52 of the Complaint.

53.     Airbus denies the allegations in Paragraph 53 of the Complaint.

54.     Airbus denies the allegations in Paragraph 54 of the Complaint.

## AIRBUS' AFFIRMATIVE DEFENSES

Airbus asserts the following defenses in response to the allegations in Firepass' Complaint.  Airbus specifically reserves all rights to allege additional defenses that become known through the course of discovery:

55.     **Non-Infringement.**  Airbus has not infringed, and is not infringing, (either directly, contributorily, or by inducement) any claim of the Asserted Patents.

56.     **Invalidity.**  The claims of United States Patent Numbers 6,314,754 ("the '754 patent"), 6,418,752 ("the '752 patent"), 7,207,392 ("the '392 patent"), and United States Reissue Patent Number RE 40,065 ("the RE '065 patent") (collectively and individually, "the Asserted Patents"), as properly construed, are invalid for failure to comply with one or more of the requirements of 35 U.S.C. § 101 *et seq.*, including, without limitation, sections 102, 103 and 112.

57.     **Unenforceability Due To Inequitable Conduct.**  The '065 reissue patent, the '752 patent, the '754 patent, and the '392 patent are each unenforceable due to inequitable conduct during the prosecution of those patents and the '315 patent.

58.     **Intervening Rights.**  Plaintiffs are partially or wholly barred from the relief sought because of Airbus' absolute and equitable intervening rights.

59.     **Estoppel.**  Firepass has dedicated to the public any methods, apparatuses, and products disclosed in the Asserted Patents, but not literally claimed therein, and is estopped from claiming infringement by any such public domain methods, apparatuses, or products.

60.    **Failure to State a Claim.**  The Complaint fails to state a claim upon which relief can be granted.

61.    **Waiver, Laches and/or Estoppel.**  The claims of the Asserted Patents are barred, in whole or in part, by doctrines of waiver, laches and/or estoppel, including prosecution laches, equitable estoppel, and/or prosecution history estoppel.

62.    **Failure to Fulfill Reissue Requirements / Impermissible Recapture.**  One or more of the claims of the RE '065 patent are invalid for failure to comply with 35 U.S.C. § 251 by virtue of Firepass' failure to fulfill the requirements for a reissue patent.

63.    **Double Patenting.**  One or more of the claims of the Asserted Patents are invalid for double patenting.

64.    **Failure to Fulfill Requirements for Obtaining Damages.**  On information and belief, Firepass' alleged damages are limited because it has not satisfied the requirements for obtaining damages under 35 U.S.C. § 287 from the date the patents issued.

65.    **No Entitlement to Injunctive Relief.**  Firepass is not entitled to injunctive relief because any alleged injury to Firepass is not immediate or irreparable, and Firepass has an adequate remedy at law.

<u>**AIRBUS' COUNTERCLAIMS**</u>

For its counterclaims against Plaintiffs and Counter-Defendants Firepass IP Holdings, Inc. and Firepass Corporation (collectively, "Firepass"), Defendants and Counter-Plaintiffs Airbus Americas, Inc. and Airbus S.A.S. (collectively "Airbus") state as follows:

## THE PARTIES

66.      Airbus Americas, Inc. is a Delaware corporation having a principle place of business at 198 Van Buren St., Suite 300, Herndon, Virginia 20170.

67.      Airbus S.A.S. is a corporation organized and existing under French law, with its principal office at 1, Rond Point Maurice Bellonte, 31707 Blagnac Cedex, France.

68.      On information and belief, Firepass Holdings is a corporation organized and existing under the laws of the State of Delaware, with its address at P.O. Box 2021, New York, NY 10159, and is the owner and assignee of United States Patent Numbers 6,314,754 ("the '754 patent"), 6,418,752 ("the '752 patent"), and 7,207,392 ("the '392 patent").

69.      On information and belief, Firepass Corporation is a corporation organized and existing under the laws of the State of Delaware, with its headquarters at 19 W. 21st Street, Suite 503, New York, NY 10010, and is the owner and assignee of United States Reissue Patent Number RE 40,065 ("the RE '065 patent").

## NATURE OF THE ACTION

70.      These counterclaims seek, *inter alia*, a judgment declaring that the claims of the Asserted Patents are invalid, unenforceable and not infringed by Airbus.

## JURISDICTION AND VENUE

71.      This action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.* This Court has subject matter jurisdiction over the action under 28 U.S.C. §§ 1331 and

11

1338(a)-(b) and under the Declaratory Judgment Act 28 U.S.C. §§ 2201 *et seq.*, and § 1332(a).

Venue is proper in this Court under 28 U.S.C. § 1400(b) and § 1391(b)-(c).

72.     This Court has personal jurisdiction over Plaintiffs, who have submitted to such

jurisdiction by bringing a complaint in this Court alleging that Parker Hannifin Corporation and

Airbus have infringed the claims of the RE '065 patent, the '752 patent, the '754 patent, and the

'392 patent (collectively and individually "Asserted Patents").

## FACTS GIVING RISE TO THE COUNTERCLAIMS

73.     On October 1, 2009, Counterclaim-Defendants commenced a civil lawsuit against

Parker Hannifin Corporation  ("Parker") and Airbus Americas, Inc. and Airbus S.A.S. alleging

that Parker and Airbus infringed one or more claims of the Asserted Patents.

74.     Counterclaim-Defendants created an actual and justiciable case and controversy

between Counterclaim-Defendants and Airbus concerning whether the claims of the Asserted

Patents are valid and/or infringed by Airbus.

75.     Airbus has not directly or indirectly infringed, and is not directly or indirectly

infringing, upon any claims of the Asserted Patents.

## FIRST COUNTERCLAIM

### Non-Infringement of U.S. Patent Nos.
### RE 40,065, 6,418,752, 6,314,754, and 7,207,392

76.     Airbus incorporates by reference each and every allegation set forth in Paragraphs

1 through 75 of its Answer, Affirmative Defenses and Counterclaims set forth herein, as if fully

set forth and restated herein.

77.     Airbus does not directly or indirectly infringe any claim of the Asserted Patents.

78.     An actual controversy exists between Airbus and Firepass as to whether the Asserted Patents are infringed.

79.     A judicial declaration is necessary and appropriate so that Airbus may ascertain its rights as to whether the Asserted Patents are infringed.

### SECOND COUNTERCLAIM

**Invalidity of U.S. Patent Nos.**
**RE 40,065, 6,418,752, 6,314,754, and 7,207,392**

80.     Airbus incorporates by reference each and every allegation set forth in Paragraphs 1 through 79 of its Answer, Affirmative Defenses, and Counterclaims set forth herein, as if fully set forth and restated herein.

81.     The claims of the Asserted Patents are invalid for failure to comply with the requirements of the patent laws of the United States, 35 U.S.C. § 100, *et seq.*, including, but not limited to, those set forth in 35 U.S.C. §§ 102, 103, 112 and/or 251.

82.     An  actual controversy exists between Airbus and Firepass as to whether the Asserted Patents are valid.

83.     A judicial declaration is necessary and appropriate so that Airbus may ascertain its rights as to whether the Asserted Patents are valid.

### THIRD COUNTERCLAIM

### Unenforceability of U.S. Patent Nos.
### RE 40,065, 6,418,752, 6,314,754, and 7,207,392 Due To Inequitable Conduct

84.     Airbus incorporates by reference each and every allegation set forth in Paragraphs 1 through 83 of its Answer, Affirmative Defenses, and Counterclaims set forth herein, as if fully set forth and restated herein.

85.     Individuals subject to the duty of disclosure under 37 CFR 1.56 engaged in inequitable conduct by withholding or misstating material information with intent to deceive the United States Patent & Trademark Office ("USPTO") in connection the prosecution of the patent applications that resulted in the issuance of the '752, '754, '392, '315 (the original patent for which the RE '065 patent is a reissue) and RE '065 patents.  That conduct renders all of the Asserted Patents unenforceable.

86.     Kotliar drafted and filed *pro se* U.S. Patent Application No. 09/566,506 ("the '506 application") with the USPTO on May 08, 2000.  The '506 application issued as the '315 patent on January 1, 2002.

87.     Kotliar drafted and filed *pro se* U.S. Patent Application No. 09/551,026 ("the '026 application") with the USPTO on April 17, 2000.  The '026 application issued as the '754 patent on November 13, 2001.

88.      Kotliar drafted and filed *pro se* U.S. Patent Application No. 09/750,801 ("the '801 application") with the USPTO on December 28, 2000.  The '801 application issued as the '752 patent on July 16, 2002.

89.     Kotliar filed U.S. Patent Application No. 11/198,862 ("the '862 application") with the USPTO on August 5, 2005, seeking reissue of the '315 patent.  The '862 application issued as the RE '065 patent on February 19, 2008.

90.     Kotliar filed U.S. Patent Application No. 11/199,770 ("the '770 application") with the USPTO on December August 8, 2005.  The '770 application issued as the '392 patent on April 24, 2007.

91.     The Asserted Patents all pertain to related subject matter and contain closely related disclosures on the issue of fire protection.  The '315 patent claims to be a continuation-in-part of the '754 patent; the '752 patent claims to be a continuation-in-part of the '754 and '315 patents; and the '392 claims to be a continuation of the '754 and '315 patents and a continuation-in-part of the '752 patent.

92.     The claims of the '754 patent relate to providing a breathable atmosphere with oxygen content between 12% and 18% in human occupied or visited facilities.

93.     The claims of the '315 patent relate to providing a breathable atmosphere with oxygen content with less than 12% in enclosed environments.

94.     The claims of the '752 patent relate to providing a breathable atmosphere with oxygen content between 10% and 18% in human occupied or visited facilities.

95.     The claims of the '392 patent relate to providing a breathable atmosphere with oxygen content between 12% and 18%, and with either elevated or decreased carbon dioxide content, in human occupied or visited facilities.

96.     The claims of the RE '065 patent relate to providing an atmosphere with oxygen content between 9% and 12% in computer cabinets or industrial containers.

97.     The Asserted Patents claim systems and methods that use air separation technology known in the prior art.

98.     Each individual associated with the filing and prosecution of the applications that resulted in the issuance of the '315 patent and the Asserted Patents had a duty of candor and good faith in dealing with the USPTO, including a duty to disclose to the USPTO all information known to that individual to be material to patentability as defined in 37 C.F.R. § 1.56.  These individuals will be further referred to as "person(s) with a duty of disclosure" for each of the respective "506, '026, '801, '770 and '862 applications.  As an inventor, patent applicant, and a person who participated in the drafting and prosecution of each of the Asserted Patents and the '315 patent, Kotliar is among these individuals.  On information and belief, Robert Isackson, who participated in the preparation and prosecution of the patent applications that resulted in the issuance of the '392 and RE '065 patents is also among such individuals.

99.     In a continuation-in-part application, persons with a duty of disclosure have a duty to disclose to the USPTO all information known to be material to patentability which became available between the filing date of the prior application and the filing date of the continuation-in-part application.

100.    The Manual of Patent Examining Procedure ("MPEP") has several provisions discussing the mandatory and important nature of the duties of disclosure to the USPTO.  By way of example, 37 CFR 1.56, which defines the duty of disclosure, states, "The [USPTO]

encourages applicants to carefully examine [p]rior art cited in search reports of a foreign patent office in a counterpart application."

101.    Further, MPEP 2001.06 states that "individuals may be or become aware of material information from various sources such as, for example, co-workers, trade shows, communications from or with competitors, potential infringers, or other third parties, related foreign applications. . ."

102.    MPEP 2001.06(a) states, "Applicants and other individuals, as set forth in 37 CFR 1.56, have a duty to bring to the attention of the Office any material prior art or other information cited or brought to their attention in any related foreign application.  The inference that such prior art or other information is material is especially strong where it has been used in rejecting the same or similar claims in the foreign application, or where it has been identified in some manner as particularly relevant."

103.    As discussed in greater detail below, on information and belief, Kotliar committed at least the following acts of withholding or misstating material information with intent to deceive the USPTO:

a.  Withheld numerous material prior art references that were identified as highly relevant references in an International Search Report, and that were cited by patent examiners in rejecting claims in Kotliar's foreign counterpart applications;

b.  Withheld highly material prior art that he cited to and relied on in authoring Firepass promotional materials and articles, and/or that he knew of at least from attending industry and/or FAA meetings; and.

c.   Submitted a false declaration and made misrepresentations to the USPTO during the prosecution of the application that resulted in the RE '065 patent.

104.   The aforementioned instances of withholding and/or falsely misstating material information were done and/or made willfully in bad faith with the intent to obtain that to which Kotliar would not otherwise been entitled.

105.   Each of the Asserted Patents is unenforceable due to Kotliar's inequitable conduct.

**Kotliar Withheld Highly Material Prior Art That Was Repeatedly Cited by Foreign Patent Offices Against His Foreign Counterpart Applications**

106.   During the prosecution of the '752, '392 and RE '065 patent applications, material references that were identified in an International Search Report in a related, co-pending International Application, and that were relied upon in the subsequent national phase examinations of the corresponding foreign patent applications, were knowingly withheld from the USPTO by Kotliar.

107.   On April 5, 2001, Kotliar filed an International Patent Application Number PCT/IB01/01505 under the Patent Cooperation Treaty ("PCT") that claimed priority to, among others, the '752 patent, and designated for national phase prosecution numerous states, including but not limited to Australia, Canada, China, Europe, Israel, Norway, and Russia. This patent application was published on October 25, 2001 as WO 01/78843.

108.   On March 22, 2002, the European Patent Office, acting as the International Search Authority in WO 01/78843, mailed an International Search Report ("Search Report") to

Kotliar listing thirteen prior art references ("Search Report References") as "Documents

Considered to Be Relevant."

109.    Of the thirteen Search Report References, seven documents were marked as "X"

references, which are defined in the Search Report as "document of particular relevance: the

claimed invention cannot be considered novel or cannot be considered to involve an inventive

step when the document is taken alone."  The X references listed in the March 22, 2002

International Search Report were: EP 0301464A; WO 99/47210; FR 2748396A; US 3,893,514;

US 3,715,438; US 5,887,439; and JP 2000153004A.

110.    The remaining six Search Report References were marked as "Y" references,

which are defined in the Search Report as "documents of particular relevance: the claimed

invention cannot be considered to involve an inventive step when the document is combined with

one or more other such documents, such combination being obvious to a person skilled in the

art."  The Y references listed in the March 22, 2002 International Search Report were WO

96/37176; WO 98/34683; US 5,799,652; EP 0234056; US 4,121,790; and EP 0374333.

111.    X Reference US 5,887,439 and Y References WO 96/37176, WO 98/34683, US

5,799,652 are Kotliar patents or applications. On information and belief, the remaining X and Y

references cited in the March 22, 2002 International Search Report were material prior art to the

'752, '392 and RE '065 patent applications.

112.    As an example of the materiality of the references in the search report, X

Reference US 5,887,439 specifically teaches using air separation to produce a breathable low

oxygen concentration environment in which many materials at 15% oxygen lose their

inflammability. It is clear from this teaching that an environment with a diluted concentration of

oxygen at or below 15% will extinguish fire and/or inhibit the ignition of fire.  X Reference US 5,887,439 also discloses using air separation units with molecular sieves or using other air recycling technology for reducing the oxygen content to a desired level of between 5-15% oxygen relative to the oxygen content of the outside ambient air.  As such, the X Reference US 5,887,439 makes use of any air separation system with molecular sieves or air recycling system for reducing the concentration of oxygen prior art.  Accordingly, the withholding of this reference was done willfully in bad faith with the intent to obtain that to which Kotliar would otherwise not have been entitled.

113.    International Publication No. WO 01/78843 entered into national phase prosecution in Australia, Canada, China, Europe, Israel, Japan, Norway, and Russia.

114.    On May 27, 2003, the examiner in the corresponding European national phase application that became EP 1274490, relied on the Search Report References as a basis for rejection of the European application.

115.    Kotliar and/or his prosecution counsel submitted a November 24, 2003 response to the May 27, 2003 rejection that contained arguments related to the technical disclosures of the Search Report References.

116.    On January 26, 2004, the European examiner rejected claims of the pending European application in light of WO 99/47210A, one of the "X" Search Report references.

117.    Additionally, the examiner in Kotliar's Australian counterpart application, AU 2001277654, also relied on the Search Report. In the June 24, 2005 Search Information

Statement, the Australian examiner cited US 5,887,439; EP 2748396 (referred to as FR 2748396 in the International Search Report); AU 747436; and US 3,893,514.

118.    The materiality of the Search Report References was known to Kotliar and/or one or more persons involved in the prosecution of the '752, '392 and RE '065 patent applications because, *inter alia,* the Search Report References were identified as particularly relevant as "X" and "Y" references by the International Search Authority, were cited by examiners in rejecting the claims of Kotliar's foreign counterpart applications, and because they were addressed by Kotliar and/or his attorney in responding to multiple examiners' rejections.

119.    On information and belief, Kotliar and/or other persons with a duty of disclosure in the prosecution of the '752, '392 and RE '065 patent applications withheld the International Search Report and the following material Search Report References from the PTO with the intent to deceive: EP 0301464A; WO 99/47210; FR 2748396A; US 3,893,514; US 3,715,438; JP 2000153004A, EP 0234056; US 4,121,790; and EP 0374333.

120.    The aforementioned withholding of material Search Report References from the PTO was done willfully in bad faith with the intent to obtain that to which Kotliar would not otherwise been entitled.

**During Prosecution of the Asserted Patents and the '315 Patent, Kotliar Withheld Material Prior Art That He Relied on in Authoring Promotional Articles.**

The 1998 ARAC Report

121.    The use of reduced oxygen concentrations, including the use of increased nitrogen levels, for fire safety in aircraft fuel tanks has been studied since at least the 1950s.

122.     By 1997, the FAA had convened a group of governmental and private stakeholders to study fuel tank inerting as a part of the FAA's Aviation Rulemaking Advisory Committee (ARAC).

123.     ARAC's "Inerting Task Group," also known as Task Group 3, published a report in 1998 (the "1998 ARAC Report") that is focused on the design, feasibility, use and testing of fuel tank inerting systems to reduce or eliminate fuel tank flammability.

124.     The 1998 ARAC Report discusses the use of molecular sieves and air separation membranes - the same technology disclosed in the Asserted Patents - in order to reduce the oxygen concentrations of the fuel tank ullage to the levels claimed in each of the Asserted Patents and the '315 patent. For example, the 1998 ARAC Report states as follows:

> Nitrogen inerting works by reducing the oxygen concentration in the fuel tank ullage below that necessary to support combustion. Literature indicates that at 9% oxygen or below no reaction will occur in a tank with Jet A fuel regardless of the fuel air mixture or the ignition energy.  Some testing has indicated that for most conditions 10-11% oxygen levels provides the same level of protection.  Oxygen levels above the no reaction level but below 16% have been shown to provide some protection and reduce the pressure rise in reactions that do occur.

125.     In addition, paragraph 8.6 of the 1998 ARAC Report states that "all inerting systems are designed to minimize the accumulation of $O_2$ in a confined space" and paragraph 4.7.1 teaches that air separation membranes, such as molecular sieves, may be used to lower the oxygen concentration.  Moreover, paragraph 9.3 refers to the cost of air separator technology for inerting the fuel tank of aircraft.  Accordingly, the 1998 ARAC Report applies as a direct prior art teaching for reducing the oxygen concentration within an enclosed space using a membrane or air separation technology, inclusive of a fuel tank, to 15% or below oxygen and particularly to

11% or below oxygen for preventing the occurrence of a reaction and is clearly material to the prosecution of the '315 patent and RE '065.

126.    Kotliar had knowledge of the 1998 ARAC Report during the prosecution of the Asserted Patents and the '315 patent.

127.    On information and belief, Kotliar knew of the 1998 ARAC Report from attending industry and FAA meetings and presentations in which the 1998 ARAC Report was discussed.

128.    During the prosecution of the '315, '752 and '754 patent applications, and before the '392 and RE '065 patent applications were filed, Kotliar attended the Third Triennial International Aircraft Fire & Cabin Safety Conference on October 22-25, 2001 in Atlantic City, New Jersey.

129.    On information and belief, Kotliar knew of the existence and contents of the 1998 ARAC Report at the least by the time he attended the Third Triennial International Aircraft Fire & Cabin Safety Conference.

130.    The 1998 ARAC Report was part of the FAA's and the industry's research efforts regarding fuel tank inerting art at the time, as is evidenced by the references to the Report in each of the following presentations regarding fuel tank inerting from the 2001 Conference that Kotliar attended:

> i.   *Measurement of Oxygen Concentration in a Boeing 737 Center Wing Fuel Tank During Ground and Flight Testing;* and
>
> ii.  *On-Board Ground Inerting (OBGI) Systems for Transport Category*

*Aircraft.*

131.    In 2002 Kotliar authored and published a paper entitled, "Catastrophic Tunnel Fires Can Be Prevented and Suppressed" ("the Tunnel Fire Article").

132.    In 2003 Kotliar published the Tunnel Fire Article again in Tunnel Management International.

133.    Kotliar cites the 1998 ARAC Report multiple times in the Tunnel Fire Article. One of the propositions for which Kotliar cites the 1998 ARAC Report is, "US [FAA] researchers conducted tests to evaluate fuel tank inerting requirements for ground based fires and found a range of fire protection from 9% up to 18% oxygen concentrations."

134.    Further, in that article, Kotliar states that fuel tank inerting has occurred since the 1950s and admits the following: "[Hypoxico's experiments] correspond to the data obtained by military researchers. It was found that when oxygen concentration fell lower than 16.8% at standard climatic conditions, no ignition of common combustible materials was possible."

135.    An oxygen concentration range of 9% to 18% covers the entire range of oxygen concentrations that are claimed in the Asserted Patents.

136.    To the extent that the '752, '754 and '392 patents are interpreted to cover aircraft fuel tanks, the 1998 ARAC Report is highly material prior art to the patent applications that resulted in the those patents.

137.    The 1998 ARAC Report is highly material prior art to the patent applications that resulted in the '315 and RE '065 patents.

138.    The 1998 ARAC Report was not disclosed to the USPTO during the prosecution of the application that resulted in the Asserted Patents or the '315 patent.

139.    Kotliar and/or others having the duty of disclosure in the prosecution of the applications that resulted in the Asserted Patents and the '315 patent knew that the 1998 ARAC Report was material to the applications that resulted in the Asserted Patents and the '315 patent.

140.    On information and belief, Kotliar and/or others involved in the prosecution of the applications that resulted in the Asserted Patents and the '315 Patent withheld the 1998 ARAC Report from the PTO during the prosecution of the applications that resulted in the Asserted Patents and the '315 patent, with the intent to deceive the PTO.

141.    The aforementioned withholding of the 1998 ARAC Report from the PTO was done willfully in bad faith with the intent to obtain that to which Kotliar would not otherwise been entitled.

The Tunnel Fire References

142.    In addition to the 1998 ARAC Report, Kotliar also cites to the following articles and reports in the Tunnel Fire Article (collectively, "the Tunnel Fire References"): *Inerted Fuel Tank Oxygen Concentration Requirements,* FAA Report FAA-RD-71-42 (August 1971); Stewart et al., *Inerting Conditions for Aircraft Fuel Tanks,* WADC-TR-55-418 (September 1955); and Summer, S.M., *Fuel Tank Ignition Studies at Reduced Pressures and Oxygen Concentrations,* International Aircraft Systems Fire Protection Working Group Presentation, Atlantic City, NJ, USA (Aug. 29, 2000).

143.    The Tunnel Fire References disclose experiments, studies and systems related to preventing fires in fuel tanks by reducing fuel tank ullage oxygen concentration to ranges that include those claimed in the '392 and RE '065 patents.

144.    The Tunnel Fire References all qualify as prior art to the '392 patent under 35 USC 102(b) and/or 103(b).  All of the Tunnel Fire References except *Fuel Tank Ignition Studies at Reduced Pressures and Oxygen Concentrations* qualify as prior art to the RE '065 patent under 35 USC 102(b) and/or 103(b).

145.    On information and belief, to the extent that the '392 patent is interpreted to cover aircraft fuel tanks, the Tunnel Fire References as well as the Tunnel Fire Article itself contain information that is material to the '392 patent application.

146.    On information and belief, the Tunnel Fire References as well as the Tunnel Fire Article itself contain information that is material to the applications that resulted in the RE '065 patent.

147.    Kotliar did not disclose the Tunnel Fire Article or the Tunnel Fire References during the prosecution of the '392 or RE '065 patent applications.

148.    Kotliar and/or others involved in the prosecution of the applications that resulted in the '392 and RE '065 patents knew that the Tunnel Fire Article and the Tunnel Fire References were material to the '392 and RE '065 patent applications.

149.    On information and belief, Kotliar and/or others involved in the prosecution of the '392 and RE '065 patent applications withheld the Tunnel Fire Article and the Tunnel Fire

References from the USPTO during the prosecution of those applications, with the intent to deceive the USPTO.

150.    The aforementioned withholding of the Tunnel Fire Article and the Tunnel Fire References from the PTO was done willfully in bad faith with the intent to obtain that to which Kotliar would not otherwise been entitled.

The Total Flooding Article.

151.    The '392 patent is unenforceable because Kotliar and/or one or more persons with a duty of disclosure in the prosecution of United States Patent Application No. 11/199,770 withheld material prior art from the USPTO during the prosecution of those applications, with the intent to deceive the USPTO.

152.    On information and belief, in 2003, Kotliar authored and published an article entitled, "FIREPASS - A New Technology for Total Flooding Application" (the "Total Flooding Article").  In the Total Flooding article, Kotliar cites multiple times an October 30, 1992 report authored by Lambertsen et al. that was published by the Environmental Biomedical Data Center, Institute for Environmental Medicine at the University of Pennsylvania, Philadelphia, PA, entitled, *Research Bases for Improvement of Human Tolerance to Hypoxic Atmospheres in Fire Prevention and Extinguishment* ("the Lambertsen Report").

153.    The Lambertsen Report discusses the beneficial effects of the addition of carbon dioxide to hypoxic atmospheres, in the context of fire suppression.

154.    Lambertsen is also an inventor of an "X" Search Report Reference that Kotliar withheld from the PTO, EP 0301464, that also discloses the beneficial effects on respiration from the addition of carbon dioxide to hypoxic atmospheres.

155.    The Lambertsen Report qualifies as prior art to the '392 patent under 35 USC 102(b) and/or 103(b).

156.    The Total Flooding Article itself contains information that is prior art to the '392 patent under 35 USC 102(b) and/or 35 USC 103(b).

157.    The Lambertsen Report and the Total Flooding Article each contain information that is material prior art to the '392 patent application.

158.    Kotliar and/or other persons involved in the prosecution of the '392 patent application knew that the Lambertsen Report and the Total Flooding Article contained information that was material to that application.

159.    Kotliar did not disclose the Lambertsen Report or the Total Flooding Article during the prosecution of the '392 patent application.

160.    On information and belief, Kotliar and/or other persons involved in the prosecution of the '392 patent application withheld the Lambertsen Report and the Total Flooding Article from the PTO during the prosecution of that application with the intent to deceive the PTO.

161.    The aforementioned withholding of the Lambertsen Report and the Total

Flooding Article from the PTO was done willfully in bad faith with the intent to obtain that to

which Kotliar would not otherwise been entitled.

**Kotliar Knowingly Submitted False Statements and Declarations to the PTO During the Prosecution of the RE '065 Patent Application.**

162.    The '315 patent's claims relate to providing, for an enclosed environment, a fire

retarding gas mixture having an oxygen concentration of under 12%.

163.    Kotliar filed application serial number 11/198,862 on August 5, 2005 seeking

reissue of the '315 patent.

164.    Kotliar filed a Reissue Application Declaration by the Inventor with his

application that stated, "Claims 2 and 5 claim oxygen content below 12% and should be

restricted to above 9%-12%, as per amendment."

165.    The Reissue Request and Amendment, filed August 5, 2005, stated "This

Amendment is being filed in order to correct an error discovered during recent studies of the

prior art."  he reissue application amended the claimed oxygen percentage to an "oxygen content

below 12%, but greater than 9%, and preferably in the range between 10% and 12%."

166.    In an office action dated October 6, 2006, the examiner stated "[t]he reissue

oath/declaration filed with this application is defective because it fails to identify at least one

error which is relied upon to support the reissue application."

167.   The falsity of the information is particularly evident from the intentional withholding of the 1998 ARAC Report which Kotliar knew teaches that no reaction at all will occur in the ullage space of an aircraft fuel tank at a concentration of 11% oxygen or lower.

168.   On May 27, 2007, Kotliar submitted a new Reissue Application Declaration that stated:

> After the patent issued, I became aware of prior art concerning my invention for providing a fire extinguishing atmosphere in enclosed environments that disclosed an atmosphere having an oxygen content of less than 9%. I then realized that by claiming a range of less than 12% oxygen, I had inadvertently claimed more than I had a right to claim In addition, I realized that in reviewing the prior art that I had claimed a system that broadly covered an enclosed environment, which was also broader than I had a right to claim.. . These errors came to my attention in the Summer of 2005 when I consulted with a patent attorney, Robert M. Isackson, Reg. No. 31,110, who also assisted with the preparation of this document.

169.   Kotliar filed the Reissue Application Declaration that contained the following statement: "I acknowledge the duty to disclose information that is material to the patentability of this application, namely, information where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent."

170.   On information and belief, at the time Kotliar filed the August 5, 2005 Reissue Request and Amendment and the May 27, 2007 Reissue Application Declaration, Kotliar knew that they contained false information.

171.   On information and belief, Kotliar was aware at least as early as 2001 that the 1998 ARAC Report disclosed that FAA researchers conducted tests to evaluate fuel tank inerting requirements for ground based fires and found a range of fire protection from 9% up to 18%

oxygen concentrations. In at least 2001, Kotliar attended at least one meeting in which the 1998
ARAC report was disclosed. In 2002, he cited the 1998 ARAC Report for this proposition in the
Tunnel Fire Article in 2002.

172.    On information and belief, Kotliar knew when he submitted his August 5, 2005
Patent Reissue Request and Amendment that his representation to the USPTO that the "error"
was "discovered during recent studies of the prior art" was false.

173.    On information and belief, Kotliar knew when he submitted his May 27, 2007
Reissue Application Declaration that it falsely claimed "these errors came to my attention in the
Summer of 2005," because, *inter alia,* at least by 2001, Kotliar was aware of and cited fuel tank
inerting references that disclosed an oxygen content below 9%.  or example, the 1998 ARAC
Report states, "literature indicates that at 9% oxygen or below no reaction will occur in a tank
with Jet A fuel regardless of the fuel air mixture or the ignition energy."

174.    On information and belief, Kotliar knowingly made these false statements
regarding the supposed 2005 discovery of his "error" with the intent to deceive the PTO, so that
he could obtain a reissue patent.

175.    Kotliar's false statements to the USPTO regarding the 2005 discovery of his
"error" were material at least because a reasonable examiner would have found them important
when determining whether to allow the claims of the reissue application.

176.    Kotliar also made knowingly false statements to the USPTO in both the May 21,
2007 Reissue Declaration and the August 5, 2005 Patent Reissue Request and Amendment, by

representing that he was entitled to claim the 9% to 12% oxygen range, and that he was able to claim industrial fuel tanks with flammable material.

177.    As discussed above, Kotliar was aware as early as 2001, but in no event later than 2002, that the FAA in the 1998 ARAC Report "found a range of fire protection [in fuel tanks] from 9% up to 18% oxygen concentrations.

178.    On information and belief, Kotliar knowingly made these false representations regarding the oxygen range to which he was entitled, and regarding his ability to claim industrial containers, including fuel tanks, containing fire-hazardous materials, with the intent to deceive the PTO, so that the examiner would allow the claims of the reissue patent.

179.    Kotliar's false representations regarding the oxygen range to which he was entitled, and regarding his obtained patent claims directed to fuel tanks containing fire-hazardous materials, were material at least because a reasonable examiner would have found them important when determining whether to allow the claims of the reissue application.

180.    The aforementioned instances of false misstatements and representations regarding the oxygen range to which he was entitled, and regarding his ability to claim industrial containers, including fuel tanks, containing fire-hazardous materials, were made willfully in bad faith with the intent to obtain that to which Kotliar would not otherwise been entitled.

181.    An actual controversy exists between Airbus and Firepass as to whether the Asserted Patents are unenforceable.

182.    A judicial declaration is necessary and appropriate so that Airbus may ascertain its rights as to whether the Asserted Patents are unenforceable.

## FOURTH COUNTERCLAIM

### Unenforceability of U.S. Patent Nos.
### RE 40,065, 6,418,752, 6,314,754, and 7,207,392 –
### Infectious Unenforceability/Unclean Hands

183.   Airbus incorporates by reference each and every allegation set forth in Paragraphs 1 through 182 of its Answer, Affirmative Defenses, and Counterclaims set forth herein, as if fully set forth and restated herein.

184.   The Asserted Patents and the '315 patent pertain to significantly related subject matter and contain closely related disclosures on the issue of fire protection.

185.   The '754 patent is the parent application of the Asserted Patents; the '315 patent claims to be a continuation-in-part of the '754 patent; the '752 patent claims to be a continuation-in-part of the '754 and '315 patents; the '392 claims to be a continuation of the '754 and '315 patents and a continuation-in-part of the '752 patent; and the RE '065 patent is a reissue of the '315 patent.

186.   The aforementioned broad pattern of inequitable conduct with respect to the applications of the '754 patent and its descendants will infect the entire family of Asserted Patents and will render such patents unenforceable.

187.   The inequitable conduct that occurred in the applications of the '754 patent and its descendants is directly related to the claims of the Asserted Patents sought to be enforced.

188.   An actual controversy exists between Airbus and Firepass as to whether the Asserted Patents are unenforceable.

189.    A judicial declaration is necessary and appropriate so that Airbus may ascertain its rights as to whether the Asserted Patents are unenforceable.

## PRAYER FOR RELIEF

WHEREAS, Airbus prays that this Court grant the following relief and judgment:

A.    That no injunctive relief issue to Firepass;

B.    That Firepass take nothing by reason of its Complaint;

C.    As to Airbus' First Counterclaim, that the valid claims, if there are any, of the Asserted Patents be adjudged not infringed, either directly or indirectly, by Airbus;

D.    As to Airbus' Second Counterclaim, that the claims of the Asserted Patents be adjudged invalid;

E.    As to Airbus' Third and Fourth Counterclaims, that the claims of the Asserted Patents be adjudged unenforceable due to inequitable conduct during the prosecution of the applications for those patents and the '315 patent;

F.    That Airbus be awarded its costs and expenses in conjunction with this lawsuit;

G.    That this action be declared exceptional under 35. U.S.C. § 285, and judgment be entered awarding Airbus its costs and reasonable attorneys fees; and

H.    Such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

In accordance with Federal Rule of Civil Procedure 38(b), Airbus demands a trial by jury on all issues triable by a jury.

Dated:     New York, New York
           December 11, 2009

Respectfully submitted,

/s/ Victor Siber
George A. Stamboulidis (GS0240)
David J. Sheehan (DS4818)
Victor Siber (VS4923)
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY  10111
(212) 589-4200
vsiber@bakerlaw.com

*Attorneys for Defendants and
Counterclaimants Airbus Americas, Inc.
and Airbus S.A.S.*